781 So.2d 531 (2001)
NCP LAKE POWER, INC., etc., Appellant/Cross-Appellee,
v.
FLORIDA POWER CORPORATION, Appellee/Cross-Appellant.
No. 5D99-2401.
District Court of Appeal of Florida, Fifth District.
April 6, 2001.
*532 Phillip S. Smith and Christopher V. Carlyle of McLin, Burnsed, Morrison, Johnson, Newman & Roy, P.A., Leesburg, and John Beranek of Ausley & McMullen, Tallahassee, and Robert Scheffel Wright of Landers & Parsons, Tallahassee, for Appellant/Cross-Appellee.
Jodi L. Corrigan and A. Alexander Rhodes and Ellen L. Koehler of Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, and Rodney E. Gaddy and Jeffrey A. Froeschle, St. Petersburg, for Appellee/Cross-Appellant.

ON MOTION FOR CLARIFICATION
PER CURIAM.
We grant Florida Power Corporation's motion for clarification, withdraw our previous opinion dated January 26, 2001, and substitute the following opinion.
We are here confronted with the arduous task of interpreting contractual provisions relating to the intricate and complicated process of producing and selling electrical energy; arduous because we must grapple with terminology utilized by electrical engineers and physicists whose education and training provide them the ability to readily understand this process. However, we undertake our judicial duty assured by the knowledge that enduring legal principles formulated long ago continue to provide courts today with accurate guidance to ascertain the meaning of such technical terminology and the intent of the parties who incorporate it into their agreements.
NCP Lake Power, Inc., (Lake) appeals a final judgment entered in a breach of contract action it filed against Florida Power Corporation (FPC).[1] The trial court entered judgment in favor of Lake for $4.48 million in damages finding that FPC did breach the contract. Lake claims that this amount is not adequate to compensate it for its damages and that the trial court erred in calculating the amount of damages pursuant to the contract provisions that specify the rate Lake is to be paid by FPC for energy it produces and sells to FPC. The primary issue in this case is what rate Lake is to be paid for energy pursuant to its contract with FPC. We reverse because the trial court incorrectly determined the rate that Lake is to receive for its energy and thus incorrectly determined the damages under the contract.
Two other issues are presented by the parties. One is whether the trial court erred in dismissing count III of Lake's complaint seeking damages for FPC's alleged improper manipulation of the coal price which determines the amount of the per-hour "firm energy rate" Lake contends it is entitled to receive for its energy. Specifically, Lake contends that FPC artificially manipulated the price of coal in an effort to reduce its energy payments by altering its method of coal transportation in order to lower the delivered price of coal to its proxy plants (the avoided unit of measure) which are FPC's Crystal River 1 and 2 plants. We find that substantial competent evidence supports the trial *533 court's decision to dismiss this count of the complaint and affirm that decision without further discussion.
The other issue is whether the trial court erred in ruling that the breach of contract by FPC commenced the first day the contract was implemented resulting in damages that were calculated to include a set-off for the first thirteen months of energy payments which were paid at the "firm rate" for all energy Lake delivered to FPC. Lake contends that FPC failed to properly plead set-off as an affirmative defense or as a counterclaim. We conclude that this issue is rendered moot by our decision regarding the rate that Lake is entitled to be paid for its energy.
Thus the only issue we will address in the remainder of this opinion is the issue regarding rate and calculation of damages. We will first discuss the factual and procedural history of this case to provide an overview of how it evolved. We will next address the standard of review that we will apply in resolving this issue and then examine the legal basis for admitting and considering the extrinsic evidence that was admitted by the trial judge. Our discussion will conclude with an examination of the extrinsic evidence which provides us the necessary information to understand the terms and conditions of the contract.

Factual And Procedural Background
FPC is a public utility that supplies electrical power to millions of rate payers across the State of Florida. In order to meet its increasing energy and capacity needs, FPC solicited bids from "qualifying facilities" to purchase firm capacity and energy which FPC would in turn distribute to its customers. A qualifying facility is a cogeneration facility that meets certain energy efficiency and ownership criteria pursuant to regulations promulgated by the Federal Energy Regulatory Commission. Lake, a qualifying facility under these regulations, builds power plants to produce and supply electrical energy and generating capacity to entities like FPC.
Several qualifying facilities, including Lake, responded to FPC's solicitation for bids. FPC and Lake eventually entered into a detailed and extensive contract formally referred to by the parties as the "Negotiated Contract for the Purchase of Firm Capacity and Energy from a Qualifying Facility" (the Contract). Pursuant to the Contract, Lake agreed to construct and operate an electrical generating plant and sell its electricity to FPC. The provisions of the Contract relating to the rate that Lake is to be paid by FPC for its energy are central to resolution of the issue in this case and those provisions will be quoted later in this opinion. We find that other provisions of the Contract required Lake to choose what type of processing facility would be used as a model or proxy for determining payment, which was to be based on an "avoided unit" of measure and not on the power plant which was actually supplying the energy. These facilities are referred to as "avoided units" because FPC, by entering into a contract with a qualified facility to produce energy for it, avoids having to expend its own funds to construct and operate the facility itself. Thus an avoided unit is the generating facility that FPC would have built and operated but for the contractual commitments of Lake and other qualified facilities. Lake selected a 1991 Pulverized Coal Unit as the avoided unit pursuant to the Contract. FPC and Lake anticipated that this avoided unit would be similar to FPC's Crystal River coal plants. The record reveals that FPC already had four large pulverized coal units in its system which were similar to the avoided unit Lake selected pursuant to the Contract.
On July 1, 1993, Lake began providing electrical energy and capacity to FPC pursuant to the Contract. From the commencement date until August 8, 1994 (thirteen *534 months), it is undisputed that FPC paid Lake the "firm rate" as if the avoided unit were operating all of the time. Lee G. Schuster, Manager of Special Products for FPC, testified that an internal audit was conducted by FPC in 1993, revealing that the prices for fuel other than coal had changed such that the avoided coal plant was no longer the cheapest unit to run. Based on this assessment, Schuster testified that FPC then developed a mechanism pursuant to 9.1.2 of the Contract, implementing a procedure wherein the avoided unit would not be dispatched on a continuous basis as it had been during the initial thirteen months.
After the audit, FPC formed a strategy team to address the impact the new system would have on the contracts entered into with qualifying facilities such as Lake and to reduce payments based on the results of the audit.[2] The strategy team set forth a number of specific strategies in an internal document entitled "Cogeneration and Purchased Power Cogen Strategic Proposal." The mission statement contained in that document was:
Enhance Florida Power Corporation's (FPC) competitive position by improving the cost effectiveness of purchased power contracts and mitigate impacts of purchased power to FPC's and Florida Progress's credit ratings.
The documented proposed strategies for accomplishing that mission were: (1) "[r]educe the capacity and energy costs of FPC's purchased power contracts" by "[r]educ[ing] and maintain[ing] the cost of QF purchased power to a level comparable to competitive market alternatives, defined as a gas-fired combined cycle unit"; (2) "[m]itigate the negative impacts to FPC's and Florida Progress's credit ratings caused by purchased power contracts" by "reduc[ing] and maintain[ing] purchased power to a level below 15% of FPC's supply side capacity resources"; (3) "[o]btain generation reduction capabilities from the `QFs' to reduce total system cost and maintain proper system reliability" by "[o]btain[ing] an additional 500 MWs of generation reduction capabilities from `QFs' by the end of first quarter 1995."
On July 18, 1994, FPC notified Lake and other qualifying facilities that it would begin paying the asavailable prices for energy provided when the avoided unit was off. The record supports the fact that the scheduled shut down of the avoided unit on a daily basis is hypothetical and does not reflect actual shut down of the reference facilitiesFPC's Crystal River plants, which although cycled, are apparently never shut off except for maintenance. After sending this letter to Lake and the other qualifying facilities, FPC petitioned the Public Service Commission (PSC) for a declaration that FPC's intended actions were consistent with the PSC's contract approval. While the petition was still pending with the PSC, Lake filed its lawsuit in October 1994. On February 15, 1995, the PSC dismissed the Petition for Declaration, apparently on the ground that they did not have jurisdiction to adjudicate a dispute over a provision in a negotiated contract.

Pertinent Provisions Of The Contract And Legal Issues Raised Therefrom
The term of the Contract is twenty years, and it requires FPC to pay Lake for *535 its energy pursuant to Article 9 which details the energy pricing methodology as follows:
9.1.2 Except as otherwise provided in section 9.1.1 hereof, for each billing month beginning with the Contract In-Service Date, the QF will receive electric energy payments based upon the Firm Energy Cost calculated on an hour-by-hour basis as follows: (i) the product of the average monthly inventory chargeout price of fuel burned at the Avoided Unit Fuel Reference Plant, the Fuel Multiplier, and the Avoided Unit Heat Rate, plus the Avoided Unit Variable O & M, if applicable, for each hour that the Company would have had a unit with these characteristics operating; and (ii) during all other hours, the energy cost shall be equal to the As-Available Energy Cost.
Both parties agree that this section of the Contract requires payment of either firm or as-available energy prices depending on the operational status of the avoided unit. The firm rate is calculated pursuant to a formula which is based on the product of the average monthly inventory chargeout price of fuel burned at the avoided fuel reference plant, the fuel multiplier, and the avoided unit heat rate, plus the avoided unit variable O & M, if applicable. The hourly firm rate calculated pursuant to this formula must be paid for each hour that FPC would have had a unit with these characteristics operating. When FPC would not have had the unit operating, it would be obligated to pay the asavailable energy cost which is less than the firm energy cost.
The dispute in these proceedings is not with the formula for calculating the hour-by-hour firm energy rate or the amount of the hourly rate calculated pursuant to this formula. Rather, the dispute concerns when the avoided unit would have been operating to entitle Lake to receive payment based on this hourly rate. This issue was framed by the trial court when it entered partial summary judgment in favor of Lake on the issue of liability. The judgment provides that FPC failed "to pay Lake Cogen at the firm energy cost rate when the avoided unit with operational characteristics of an operable 1991 Pulverized Coal Unit contemplated by the Lake Cogen FPC Agreement would have been operating and at the as-available energy cost rate during those times when said avoided unit would not have been operating." The trial court did not determine the issue of when the unit would have been operating and indicated that this was an issue relating to the amount of damages. In this posture, the parties subsequently tried the case.
The trial was conducted over a three week period and both sides presented expert testimony to define and clarify the technical terms of the Contract and to attempt to explain when the avoided unit would have been in operation. After the trial concluded, the trial court resolved the issue of when the avoided unit would be operating by holding that it would operate during all on-peak hours,[3] but not during off-peak hours. The parties to these proceedings indicate that this approach was not advanced, argued, or expected by either *536 party and Lake refers to this methodology as an unsupportable "Solomonic" attempt to "split the baby." The trial court essentially found that the minimum number of hours of operation of a 1991 Pulverized Coal Unit was equal to the on-peak hours of Schedule 3 and that Lake was entitled to the firm rate during those hours and to the as-available rate for the off-peak hours. However, we find that the contract does not specifically state when the avoided unit does and does not operate. Thus the problem with the result reached by the trial court is that it assumes that the avoided unit is shut down and does not operate during the off-peak hours. Furthermore, we find nothing in the Contract that states that the on-peak hours are the only operating hours of the avoided unit. Moreover, this approach is not supported by the extrinsic evidence which explains the physical operating characteristics of a 1991 Pulverized Coal Unit.

The Standard Of Review
The interpretation of a contract is a question of law and, therefore, we are not bound by the conclusions reached by the trial court regarding construction of the Contract. See Inter-Active Servs., Inc. v. Heathrow Master Assoc., Inc., 721 So.2d 433, 434 (Fla. 5th DCA 1998). Thus decisions which construe a contract are generally subject to review on appeal by the de novo standard of review. See Gilman Yacht Sales, Inc. v. FMB Invs., Inc., 766 So.2d 294 (Fla. 4th DCA 2000); Gibbs Constr. Co. v. S.L. Page Corp., 755 So.2d 787 (Fla. 2d DCA 2000); Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla. 1st DCA 1999), rev. denied, 763 So.2d 1044 (Fla.2000); Management Computer Controls, Inc. v. Charles Perry Constr., Inc., 743 So.2d 627 (Fla. 1st DCA 1999). Therefore, we review the trial court's decision in this case pursuant to that standard.
FPC argues that because the trial court admitted and considered extrinsic evidence, the de novo standard should not be applied. We disagree because the Contract is unambiguous: both parties agree that the contract is unambiguous, the trial court found it is unambiguous, and so do we. Furthermore, the evidence admitted only explains technical terms contained in the Contract and does not alter or amend the provisions of the agreement. Moreover, even if we were to apply the substantial evidence standard to this case, considering the evidence that may support the trial court's finding that the avoided unit only operates during the designated on-peak hours, we find that such evidence is far from substantial in light of all of the other evidence and testimony contained in this record. See Elmore v. Enterprise Developers, Inc., 418 So.2d 1078, 1079 (Fla. 4th DCA 1982) ("In such cases, where the provisions of the contract are susceptible of two or more meanings and there is substantial competent evidence in the record to support the meaning adopted by the trial court, we are bound to affirm that ruling just as we would be bound to sustain a finding of fact made by the trial court on disputed issues of fact.").

Legal Basis For Admitting Extrinsic Evidence
As a general rule, when the terms and provisions of a contract are unambiguous and complete, parol evidence is not admissible to define or explain them. See McKay v. State Farm Fire & Cas. Co., 731 So.2d 852 (Fla. 4th DCA 1999); Kraft v. Mason, 668 So.2d 679 (Fla. 4th DCA), rev. dismissed, 679 So.2d 773 (Fla.1996). This court has held, however, that if an unambiguous contract contains technical terminology that may not be understood by the court, extrinsic evidence may be introduced to explain it. In Southeast Banks Trust Co., N.A. v. Higginbotham *537 Chevrolet-Oldsmobile, Inc., 445 So.2d 347 (Fla. 5th DCA 1984) this court explained:
[W]here words or phrases used in a contract have acquired a definite meaning generally or by local usage, or, where used in reference to certain things or commodities, have acquired a definite meaning among those dealing with such things or commodities, and the language used in the writing is such that the court does not understand it, oral testimony is admissible to explain the meaning of such words or phrases.
Id. at 348 (quoting Hinote v. Brigman, 44 Fla. 589, 33 So. 303, 305 (Fla.1902)).
As we have previously indicated, the Contract in the instant case, although unambiguous, is replete with technical terminology intended for electrical engineers and scientists engaged in the process of producing and selling electrical energy: not for laymen, lawyers, and judges. The trial court properly admitted extrinsic evidence to explain that terminology. For example, "Fuel Multiplier," "Avoided Unit Heat Rate," "Avoided Unit Variable O & M," "Firm Energy Cost," "As Available Energy Cost," "83% On Peak Capacity Factor," are some of the terms contained in the Contract that, even when defined in the definitions section of the Contract, are not easily understood by judges or juries without explanation by experts. Furthermore, the central issue in this case is when does a Pulverized Coal Unit operate. We find that the Contract under review does not contain all of the variables involved in the operation of a real Pulverized Coal Unit, which was Lake's contractual choice for the avoided unit. Thus extrinsic evidence was necessary to explain the technical terminology in the contract and to explain what a Pulverized Coal Unit is and how and when it operates.
Moreover, the Contract does not specifically provide the hours of operation of the avoided unit in the instant case. Therefore, in instances such as this, extrinsic evidence of custom and trade usage may be introduced to "annex incidents to a written contract" regarding matters to which the contract is silent. See Carr v. Stockton, 84 Fla. 69, 92 So. 814, 815 (Fla. 1922); Vanater v. Tom Lilly Constr., 483 So.2d 506, 508 (Fla. 4th DCA 1986) ("Where a term is missing, it may be supplied in accordance with usual, reasonable, and customary practices in the locality."); Fred S. Conrad Constr. Co. v. Exchange Bank of St. Augustine, 178 So.2d 217 (Fla. 1st DCA 1965); Orange City Hills, Inc. v. Florida Realty Bureau, Inc., 119 So.2d 43, 47 (Fla. 1st DCA 1960) (noting the listing agreement "did state most of the terms and conditions of the contemplated sale, including the purchase price and amount to be paid at time of closing; and the above missing elements are suppliable in accordance with the usual reasonable and customary practices in the locality.").
The same rule applies to introduction of the parties' course of dealing. In Cox v. CSX Intermodal, Inc., 732 So.2d 1092 (Fla. 1st DCA), rev. denied, 744 So.2d 453 (1999), for example, the court, in a case involving an unambiguous contract, stated:
[W]hen the language of a contract does not deal in express terms with all aspects of the rights and duties of the parties to the agreement, the language used `should be interpreted as reasonable persons, knowledgable about the business or industry, would likely interpret them-not some strained interpretation put forth by the drafter.'
Id. at 1096 (quoting Hussmann Corp. v. UPS Truck Leasing, Inc., 549 So.2d 215, 217 (Fla. 5th DCA 1989)). We, therefore, conclude that the trial court correctly decided to introduce extrinsic evidence in this case.

*538 The Extrinsic Evidence Admitted By The Trial Court
Now that we have determined that there is a sound legal basis for us to consider the extrinsic evidence admitted by the trial court, we will first examine the expert testimony, some of which relates to custom and trade usage, which explains what a 1991 Pulverized Coal Unit is and how and when such units operate. We will next examine the testimony relating to the provision in the Contract that requires Lake's avoided unit to achieve an on-peak capacity factor of eighty-three percent and what that means in terms of how and when the avoided unit must operate in order to comply with that requirement. We will then discuss the evidence relating to the parties' course of dealing when the Contract was presented to the PSC for approval and how the parties conducted themselves in relation to the Contract after it was approved and implemented.
Much of the extrinsic evidence demonstrates that the avoided unit, a 1991 Pulverized Coal Unit, is intended to be a baseload unit. This means that the unit is intended to operate at all times when it is available except when it is shut down for maintenance or required repairs. FPC contends that this evidence is inadmissible because the Contract does not specify that the avoided unit is a baseload unit. The testimony presented shows, however, that a Pulverized Coal Unit is currently dispatched as a baseload unit. We find that this evidence is not inconsistent with the Contract and is admissible to explain the dynamics of an actual Pulverized Coal Unit which is not apparent in the Contract. Furthermore, FPC and Lake disagree whether a Pulverized Coal Unit operates all of the time, and the Contract does not specify that the unit would not be in operation during any off-peak hours as the trial court concluded. Thus the trial court properly admitted the testimony of experts and other witnesses to explain the industry's knowledge of the operation of a Pulverized Coal Unit as a baseload unit which we find to be helpful in determining whether or not the avoided unit in the instant case operates at all times as Lake suggests.
The evidence established that all of FPC's existing coal plants are baseload units including the Crystal River Units that are listed in Schedule 3 of the Contract as the "avoided unit fuel reference plant." As mentioned earlier, the avoided unit selected by Lake is similar to these avoided unit fuel reference plants. The testimony and evidence revealed that none of FPC's similar coal plants are shut down on a regular scheduled basis, although they may be cycled down during off-peak time.[4] John Seelke, the former Cogeneration Manager for FPC who participated in the negotiation of the Contract with Lake, testified that of FPC's four existing coal units, only one had been turned off one time for reasons other than maintenance or repairs. According to the Contract with Lake, the firm rate is to be paid when a unit with the same characteristics is operating. Thus, only complete shut-down of the avoided unit would evoke the asavailable rate as opposed to the firm rate of payment. Based on the evidence and testimony that Lake's avoided unit functions as a baseload unit that operates all the time it is available, Lake should be paid the firm rate.
*539 Testimony was also admitted concerning the requirement in the Contract that the avoided unit achieve a minimum on-peak capacity factor of eighty-three percent.[5] The testimony of both FPC's and Lake's experts establishes that the avoided 1991 Pulverized Coal Unit, because of its fundamental engineering design and operational characteristics, must necessarily run all the time that it is available at its highest output in order to achieve a minimum on-peak capacity factor of eighty-three percent. While the minimum on-peak capacity factor only relates to on-peak hours of operation, the testimony of the experts demonstrated that a coal unit could not be shut down and re-started during the off-peak hours and still reach its maximum output during all of the on-peak hours.
For example, John Tucker Day, FPC's expert witness, testified that the avoided unit "would have to run essentially full out for every hour that it was available in general in order to achieve 83% capacity factor." He was also asked whether operating the avoided unit for eleven hours a day during the on-peak hours specified in Appendix C, Schedule 3 of the Contract would satisfy the minimum eighty-three percent capacity factor and he testified that "I would agree that you cannotyou cannot operate those hours and get an 83% capacity factor." Lake's expert, Kenneth John Slater, testified regarding the eighty-three percent capacity factor that the avoided unit is "really going to be running all the time that it's available. It may cycle down in megawatts to allow a level overnight, but it would still be running."
The evidence further revealed that FPC petitioned the PSC for approval of the Contract. FPC provided the PSC with data and projections of its avoided costs and of payments to be made under its contract with Lake and the other qualified facilities to demonstrate the cost effectiveness of the Contract. It is undisputed that FPC used only firm prices for the estimates, thus representing to the PSC that the contract would pay the firm rate at all times. FPC subsequently submitted a letter to the PSC correcting some of its previously submitted data but did not alter the use of the firm pricing estimates. Shortly thereafter, the PSC approved the contract.
FPC paid Lake the firm rate at all times during the first thirteen months of energy delivery which spanned the period from July 1, 1993, through August 8, 1994. Lake argues that this evidence of course of dealing shows that FPC intended to pay the firm rate during all times the unit operated. FPC objected to the introduction of this evidence as improper parol evidence. Under the circumstances of this case, we conclude that this evidence was properly introduced. See Cox.
Even though the title of the Contract states that it is a "Negotiated Contract," the record is clear that the Contract was drafted by FPC. If it intended that firm energy rates only be paid during the on-peak hours as the trial court held, FPC could have easily inserted that provision in the Contract in place of the provision that the firm rate will be paid for "each hour that the Company would have had a unit with these characteristics operating...." We conclude that the Contract requires that Lake be paid the firm energy rate for all hours that the avoided unit operates and that it operates all of the time except *540 for periods it is turned completely off for maintenance and repairs.

Conclusion
We affirm the trial court's dismissal of count III of the complaint. We find that the issue relating to set-off has been rendered moot. Regarding the rate and damages issue, we conclude that the trial court erred in failing to determine damages based on the actual operating hours of Lake's avoided unit. Therefore, that portion of the final judgment is reversed. We conclude our judicial duty in this matter by remanding this case back to the trial court for a new trial to determine the amount of damages based on the firm energy rate for all hours the avoided unit operates, which is all of the time, minus any maintenance shut-down hours.
AFFIRMED in part; REVERSED in part; and REMANDED.
COBB, PETERSON and SAWAYA, JJ., concur.
NOTES
[1] FPC filed a cross appeal contending that the trial court rejected the plain meaning of the contract and erred by admitting extrinsic evidence to explain the terms and conditions of the agreement. Although we agree that the trial court did not properly construe the rate provisions of the contract, we reject the arguments made by FPC regarding how the rate should be calculated for the energy produced by Lake. The contract provisions relating to calculation of the payment rate will be discussed in a separate section of this opinion. We find that the arguments made by FPC concerning introduction of the extrinsic evidence are without merit. The issues relating to the extrinsic evidence will also be discussed in a separate section of this opinion.
[2] According to Robert Dolan, a manager of the co-generation department of FPC at the time of contracting as well as at the time of testifying, the strategy team was assembled to determine what should be done with the contracts entered into with the qualifying facilities. He testified that the "avoided unit" of the qualifying facilities was based on similar units Crystal River 4 and 5, which are "baseload" units, meaning that they are not cycled on and off, because they are the cheapest to run.
[3] Appendix C, Schedule 3, of the Contract, entitled "Rates For Purchase of Firm Capacity and Energy From Qualifying Facility," sets forth the following:

ON PEAK HOURS
(1) FOR THE CALENDAR MONTHS OF NOVEMBER THROUGH MARCH,
ALL DAYS: 6:00 A.M. TO 12:00 NOON, AND 5:00 P.M. TO 10:00 P.M.
(2) FOR THE CALENDAR MONTHS OF APRIL THROUGH OCTOBER
ALL DAYS: 11:00 A.M. TO 10:00 P.M.
[4] Although testimony revealed that the avoided coal plant was no longer the cheapest to operate, there was no further evidence or testimony presented to support the notion that FPC's currently operating coal plants are actually shut down based on this. Moreover, Dolan testified that although the avoided unit could be cycled on and off, FPC does not practice this procedure on a daily basis.
[5] The avoided unit chosen by Lake pursuant to Article 8.2.1 of the contract was the 1991 Pulverized Coal Unit described in Appendix C, Schedule 4. Appendix C, Schedule 3 of the Contract specifically provides that this avoided unit would achieve a minimum eighty-three percent on-peak capacity factor.